FILED

## United States District Court
## Northern District of Alabama
## Southern Division

00 JAN -6 PM 1:47

U.S. DISTRICT COURT
N.D. OF ALABAMA

| | | |
|---|---|---|
| Sandra Jones, | ] | |
| Plaintiff(s), | ] ] ] | |
| vs. | ] | CV-98-N-2838-S |
| Shaner Hotel Group, d/b/a Holiday Inn Airport, | ] ] ] ] | |
| Defendant(s). | ] | |

ENTERED

JAN - 6 2000

### Memorandum

The plaintiff, Sandra Jones, brings this action against defendant, Shaner Hotel Group,, d/b/a Holiday Inn Airport , under 42 U.S.C. § 1981, alleging that the defendant subjected her to a racially hostile work environment, disparate treatment, and retaliation. Presently before the court is the defendant's motion for summary judgment (Doc. No. 24) on the racially hostile work environment claim.[1] For the reasons discussed below, the defendant's motion will be denied.

### I. Facts.

The plaintiff alleges that she began having problems with the defendant in May of 1997, when Ed Cicinato, the general manager of the Holiday Inn Airport, was not compensating her for booking parties at the hotel and for requiring her to return to work from sick leave. She claims that this discrimination by Mr. Cicinato was on account of her

---

[1] By order (Doc. No. 9) entered March 26, 1999, the court directed that any dispositive motion on the issue of hostile work environment only be filed in this case by May 15, 1999. Accordingly, Jones' disparate treatment and retaliation claims have not been addressed in the dispositive motion.

E-FILE
36649



being black. Opponent's evidence (Doc. No. 20) exhibit 1, at 106, 109-110 127-128, 130-131, 138.

Ms. Jones asserts that she went to Massoud Zandi, the food and beverage director who was second in command at the hotel, and complained to him about her problems. During that meeting, Mr. Zandi called the corporate headquarters number for Ms. Jones. Mr. Zandi confirms in his affidavit that "[i]n approximately May or June, 1997, Sandra Jones complained to me about a problem she was having with Mr. Cicinato. I picked up the telephone, dialed the number to Shaner's home office and handed the telephone to Ms. Jones. Ms. Jones then reported her complaints to whomever answered the telephone for Shaner." *Id.*, exhibit 4, ¶¶ 3-5. The plaintiff claims that she spoke to someone named Stephanie and told her that she "felt like if I was white that I would have gotten what they had claimed we would get if we brought the business in the hotel." *Id.*, exhibit 1, at 89, 106. The plaintiff further testified that she named Mr. Cicinato as the person who was treating her in a bad manner because she was black, and that he had also threatened to fire her if she did not return from sick leave. *Id.* at 106, 245. She alleges that she was told that Shaner would look into the incidents and call her back at home, but she never heard from Shaner. Further, she claims that a couple weeks later, Mr. Cicinato told her that he knew she had called the home office to complain about him and that it would not do any good. *Id.* at 89-91.

The plaintiff also alleges that around this same time, she tried to get the number for corporate headquarters herself from Anne Wilson who was working at the front desk to

2

report the problems she was having with Mr. Cicinato. Apparently, however, Mr. Cicinato came out of his office and kept her from getting the number. *Id.* at 99-101.

In July of 1997, the plaintiff asserts that Mr. Cicinato stated to her "[b]ecause of your black ass, my head of banquet captain [Arthur Flowers] is resigning," and "I will get my Mafia friends to come up here and wipe all of these niggers' ass out." *Id.* at 115, 141. The plaintiff claims that she tried to explain the situation to Cicinato but he told her to "[s]hut the fuck up." *Id.* at 115, 140.[2] The plaintiff further alleges that on this day, she requested and received a number[3] for the corporate headquarters from Candy Reese who was working at the front desk. The plaintiff attempted to call the corporate headquarters from the kitchen extension but was unable to reach anyone. She claims that she continued to call this number from the hotel and her house over the next two to three weeks but never

---

[2] Diane Walker, an employee of Shaner, states in her affidavit that Mr. Cicinato told her, the plaintiff, and Georgia Boyd, another Shaner employee "to shut the fuck up" when they tried to explain the situation with the banquet captain, and that Mr. Cicinato referred to the three of them as "bitches." Opponent's evidence (Doc. No. 20) exhibit 5, ¶¶ 3, 7. She also attests that during the confrontation, he "walked over to Ms. Jones, poked her in the shoulder and said, 'I want to see you in the bar' in an aggressive manner," and that when Jones returned she was "in tears because Mr. Cicinato had called her a black ass and accused her of making Mr. Flowers' quit." *Id.* ¶¶ 4, 6. Finally, Ms. Walker attests that "Massoud Zandi, the Food and Beverage Director, second in command at the hotel, often complained about the racial comments of Mr. Cicinato." *Id.*, ¶ 8. The plaintiff has also produced the affidavit of Ms. Boyd, who attests to all of these statements, and further states that Mr. Zandi told her that "he was calling the home office to report Mr. Cicinato." *Id.* at exhibit 6, ¶ 7.

[3] This number was a "regular" number for corporate headquarters and not the 1-800 help line. The defendant claims that it provided its employees with an employment manual and verbally gave them a 1-800 number, but the plaintiff claims that she was not there on the day this information was disseminated. The defendant does not dispute that the plaintiff requested a manual on two or three occasions but never received a personal copy of the manual. However, the plaintiff admits that she found a manual in a drawer and read the section of the manual relating to harassment policies and problem-solving procedures for grievances. The plaintiff claims that she did not know about the 1-800 number. It is undisputed that the manual did not contain a 1-800 number and that after the *Prince v. Shaner Hotel Group* (case no. CV-98-0187-s) lawsuit was filed, Shaner put up a 1-800 number in the kitchen of the hotel.

3

got in touch with anyone because she would either get a busy signal or it would just ring.[4] *Id.* at 143-44, 146-47, 162.

The plaintiff alleges that the next day after this incident, she heard Mr. Cicinato refer to a white female employee who was married to a black man as a "black bitch." *Id.* at 156-157. The plaintiff testified that later that week, Harold Gaines, the cook at the hotel, told her that Mr. Cicinato referred to her as "a black Aunt Jamima [sic] bitch," *id.* at 158-159, and that Jessie Nelson, the kitchen supervisor, told her after a meeting with Mr. Cicinato that he referred to the black employees as "the type of niggers that you take your boot and kick them in the ass." *Id.* at 164. Ms. Jones further claims that Mr. Cicinato referred to the funerals of several black women as "this must be a black woman's thing,"[5] *id.* at 176, and that Mr. Zandi told her that Mr. Cicinato had told him he could not attend the funerals, which he had referred to as "the nigger blood bath." *Id.* at 175. Further, the plaintiff testified that on one occasion she heard Mr. Cicinato refer to Maxine Duncan's (a waitress at the hotel) interracial baby as a "zebra." *Id.* at 183. The plaintiff testified generally in her deposition that "Mr. Cicinato was a cruel person. Okay? He said so many evil things on a day-to-day basis about a racial -- about black people." *Id.* at 141.

---

[4] The plaintiff admits that many of her calls occurred after business hours. She testified that she compared the number she had to that of a co-worker, who had the same number, but did not take any other measures to determine if the phone number was correct. Opponent's evidence (Doc. No. 20) exhibit 1, at 162-63.

[5] The plaintiff admits that she did not attempt to report this incident to corporate headquarters but states that another employee, Georgia Boyd, told her that she had called to report Mr. Cicinato's comments. Opponent's evidence (Doc. No. 20) exhibit 1, at 179.

4

**II. Discussion.**

**1. Prima facie case.**

In order to establish a prima facie case, the plaintiff must show that the actions of the defendant altered the condition of the workplace, creating an objectively abusive and hostile atmosphere. *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 20-21 (1993) ("When the workplace is permeated with 'discriminatory intimidation, ridicule, and insult' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment,' Title VII is violated.") (internal citations omitted). *See also, Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 67 (1986).

The plaintiff must prove that the harassment objectively and subjectively created a hostile environment. *Harris*, 510 U.S. at 21 (holding that a defendant's conduct must be severe or pervasive enough to create a work environment a reasonable person would find hostile or abusive and that the plaintiff himself subjectively views as hostile). In determining whether the defendant created a hostile work environment, the court must consider the frequency and severity of the alleged conduct, whether the conduct was threatening or humiliating, whether the conduct unreasonably interferes with the plaintiff's work performance, and the plaintiff's psychological well-being. Although all of these considerations should be taken into account, no single factor is required. *Harris*, 510 U.S. at 23; *Edwards v. Wallace Community College*, 49 F.3d 1517, 1521-22 (11th Cir. 1995).

Whether conduct is severe and pervasive is determined by the totality of the circumstances. *Faragher v. City of Boca Raton*, 524 U.S. 775 (1998). In *Walker v. Ford Motor Co.*, 684 F.2d 1355 (11th Cir. 1982), the Eleventh Circuit rejected the defendant's

5

contention that the racial slurs used at the dealership were not sufficiently pervasive. The court noted that:

> "an employer violates Title VII simply by creating or condoning an environment at the workplace which significantly and adversely affects (the psychological well-being of) an employee because of his race or ethnicity, regardless of any other tangible job detriment to the employee." Ford argues, however, that the racial slurs used by Northgate personnel were either common parlance of an automobile dealership (i.e., "nigger-rigged") or else were sporadic references and in most instances not aimed at Walker.
>
> . . . Here, however, the district court specifically found that Northgate personnel's use of the terms "nigger-rigged" and "black-ass," as well as other racially abusive language was "repeated," "continuous," and "prolonged" despite Walker's objections, and that the language made Walker feel unwanted and uncomfortable in his surroundings.

*Id.* at 1358-59 (citations omitted). The Eleventh Circuit specifically noted that "[t]he fact that many of the epithets were not directed at Walker is not determinative. The offensive language often was used in Walker's presence after he had voiced objections to Ford. Accordingly, we find that under the circumstances Northgate's conduct 'creat(ed) a working environment heavily charged with ethnic or racial discrimination.'" *Id.* at 1359 (citations omitted).

Moreover, in *Busby v. City of Orlando*, 931 F.2d 764 (11th Cir. 1991), the Eleventh Circuit again noted that:

> our circuit has held that '[t]he fact that many of the epithets were not directed at [the plaintiff] is not determinative' of whether a work atmosphere is polluted with racial discrimination. We recognize that the district court excluded the testimony because it felt that if Busby did not hear these slurs or if they were not directed toward her then she could not have experienced harassment as a result of them. Nevertheless, we hold that, in light of *Rogers* and *Walker*, the district court abused its discretion in excluding such evidence.

*Id.* at 785 (citations omitted).

Based on the above case law and evidence submitted by the plaintiff, the court finds that she has created a genuine issue of material fact on the issue of whether the defendant's conduct was severe or pervasive enough to satisfy the prima facie threshold.

### 2. Affirmative defense.

In *Faragher,* the Supreme Court held that an employer will be vicariously liable to an employee who was subjected to an actionable hostile environment if that environment was created by a supervisor. An employer, however, has available to it an affirmative defense if: (1) it exercised reasonable care to prevent and correct promptly any harassing behavior;[6] and (2) the employee unreasonably failed to take advantage of any preventive or corrective measures provided by the employer to prevent harassment.[7]

It is undisputed that Shaner had a written harassment policy and grievance procedure set forth in the employee handbook. Even if the plaintiff was not present the day the handbooks were distributed and/or was not given a handbook when she asked on several occasions, it is undisputed that she found a copy of the handbook and read the section of the handbook on Shaner's harassment policy and grievance procedure. The manual simply states: "If you feel that you have experienced harassment, report the

---

[6] As to the first prong, the *Faragher* court held that "[w]hile proof that an employer has promulgated an antiharassment policy with a complaint procedure is not necessary in every instance as a matter of law, the need for a stated policy suitable to the employment circumstances may appropriately be addressed in any case when litigating the first element of the defense." *Faragher,* 118 S.Ct. at 2279.

[7] The affirmative defense only applies if the plaintiff has not suffered a tangible employment action. The court has made no determination as to whether the plaintiff did indeed suffer a tangible employment action. However, the court finds that even if the plaintiff were unable to show a tangible job detriment, there is a genuine issue of material fact as whether the defendant could establish an affirmative defense.

7

incident immediately to the General Manager, the Vice President of Operations, the Insurance/Benefit Department, the Corporate Council or any officer of Shaner Hotel Group with whom you feel comfortable." *See* Opponent's responsive submission (Doc. No. 19) at 9, ¶ 6; Movant's reply (Doc. No. 25) at 2, ¶ 6 (emphasis added).

After the incident in May of 1997, involving payment for bookings and returning prematurely from sick leave, the plaintiff testified that she talked to Mr. Zandi about the problem and that he dialed the number for her to speak to someone at corporate headquarters. Although the defendant argues that the plaintiff did not complain about racial hostility on this occasion, the plaintiff testified that she told the person with whom she spoke that she "felt like if I was white that I would have gotten what they had claimed we would get if we brought the business in the hotel." Opponent's evidence (Doc. No. 20) exhibit 1 at 89, 106. The plaintiff further testified that she named Mr. Cicinato as the person who was treating her in a bad manner because she was black, and that he had also threatened to fire her if she did not return from sick leave. *Id.* at 106, 245. Mr. Zandi confirms in his affidavit that the plaintiff complained to him and that he dialed the number for her so that she could voice her complaints to corporate headquarters. Viewing the facts in the light most favorable to the nonmoving party, the court finds that even if the plaintiff did not complain of racial hostility per se, she at least complained of race discrimination.

As to the racial slurs directed at the plaintiff, she testified that she made a first attempt to get the number for corporate headquarters from the front desk employee, Anne Wilson, but her efforts were thwarted by Mr. Cicinato. When the plaintiff finally got the number from another employee, Candy Reese, at the front desk, she called the corporate

8

headquarters over a period of two to three weeks but never reached anyone. It is undisputed that the 1-800 help line which the defendant insists the plaintiff should have been calling was not listed in the employee manual and was only posted at the hotel after the *Prince* lawsuit was filed. Furthermore, the plaintiff testified that she checked her number with a co-worker who had the same number, and thus, the plaintiff believed she had the right number. The court finds that based on the evidence set forth by the plaintiff in this case, there is a genuine issue of material fact as to whether she unreasonably failed to take advantage of the defendant's harassment policy.[8]

Accordingly, the defendant's motion for summary judgment is hereby **DENIED**.[9]

---

[8] In addition, the court notes that both Diane Walker and Georgia Boyd stated that "Massoud Zandi, the Food and Beverage Director, second in command at the hotel, often complained about the racial comments of Mr. Cicinato." Opponent's evidence (Doc. No. 20) at exhibit 5, ¶ 8 and exhibit 6, ¶ 7 (emphasis added). Moreover, Ms. Boyd stated that Mr. Zandi told her that "he was calling the home office to report Mr. Cicinato." *Id.* at exhibit 6, ¶ 7. Mr. Zandi testified that Mr. Cicinato started working at the hotel in May of 1997, and began making racial comments about a month to a month and a half after he began working there. Mr. Cicinato's initial comments involved racial slurs directed against the executive chef at the hotel. Mr. Zandi testified that Mr. Cicinato "was basically making a lot of racial remarks in front of all the managers. And I just couldn't stand that type of -- including to myself personally. I took it. But when it went to the employees, I just couldn't take it anymore. He was just outrageous. That's all it was." Movant's evidence (Doc. No. 16) exhibit 3 at 7. However, the defendant states in its reply that it was "early October 1997 after Zandi had left Holiday Inn, [that] he called and complained about Cicinato's behavior to Shaner's Corporate Food and Beverage Director Tony Vicar." Reply (Doc. No. 25) at 9 (emphasis added). Although it is unclear whether the plaintiff specifically reported to Mr. Zandi each of the racial slurs that Mr. Cicinato had made and of which she was aware, it is clear that Mr. Zandi, plaintiff's supervisor and second in command at the hotel, knew early on of the racial slurs and racially charged environment created by Mr. Cicinato. Thus, it is questionable whether plaintiff's reporting to Mr. Zandi of each and every racial slur in every instance was necessary or simply a futile endeavor. Furthermore, the time period between Mr. Zandi's knowledge of the situation and Mr. Cicinato's actual termination on October 28, 1997, creates a genuine issue of material fact as to whether the defendant moved promptly to investigate and stop the harassment. Accordingly, summary judgment is denied insofar as the defendant's motion is predicated on the argument that the plaintiff's hostile work environment claim fails as a matter of law because Shaner moved promptly to investigate and stop the harassment.

[9] The court notes that with the resolution of the motion for summary judgment in *Jones*, it will take up the motions for summary judgment filed in the *Prince* lawsuit, which were stayed during consideration of the *Jones* motion.

Done, this \_\_\_6th\_\_\_ of January, 2000.

_____
EDWIN L. NELSON
UNITED STATES DISTRICT JUDGE